UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LATOYA AARON, as Legal Guardian of DEREK AARON,<br><br>Plaintiff,<br><br>v.<br><br>DARREN KING et al.,<br><br>Defendants. | Case No. 22-cv-11062<br>Honorable Shalina D. Kumar<br>Magistrate Judge Kimberly G. Altman |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 32)**

Plaintiff Latoya Aaron, as legal guardian of Derek Aaron ("Aaron"),[1] sued defendants Detroit police officers Darren King, Edward Pawlowski, Eugene Fielder, James McLoed (collectively, the "Officers"), and police detective Jason Kuhar in their individual capacities under 42 U.S.C. § 1983, alleging claims for excessive force under the Fourth Amendment against King, Fielder, and Pawlowski (Count I); failure to intervene against all defendants besides Kuhar; and unlawful search under the Fourth Amendment against Kuhar. ECF No. 1.

---

[1] The parties stipulated that the case caption reflect "Plaintiff, 'LATOYA AARON, as Legal Guardian of DEREK AARON, an incompetent individual', [sic] in lieu of Plaintiff, 'DEREK AARON.'" ECF No. 28, PageID.214. For simplicity, the Court will refer to the plaintiff in this case and Derek Aaron as both "Aaron."

Defendants move for summary judgment on all claims based on qualified immunity. ECF No. 32. After Aaron stipulated to dismiss Kuhar from this action in response, ECF No. 34, and the parties fully briefed the motion, ECF Nos. 31-32, 35, the Court determined that this matter is sufficient for determination without oral argument. *See* March 10, 2025 Text-Only Notice; E.D. Mich. LR 7.1(f). For the reasons below, the Court grants in part and denies in part defendants' motion.

**I.    Background**

In May 2019, Detroit police investigated two separate crimes—unarmed robbery and home invasion. ECF Nos. 32-5, 32-8. The unarmed robbery occurred on May 6, 2019 at a Sunoco gas station that Aaron regularly visited. ECF No. 32-5; ECF No. 1, PageID.4. The home invasion occurred a few days later on May 10, 2019 at a house on the same block as Aaron's house. ECF No. 32-8. Given Aaron's connections to the crime scenes and other evidence, including security footage from cameras at or near the crime scenes that showed a suspect resembling Aaron and separate photo lineup identification by the victims of the crimes, defendants sought to arrest Aaron. ECF Nos. 32-3, 32-9, 32-11, 32-15, 32-17.

Following a report of Aaron's presence at the Sunoco gas station on May 17, 2019, the Officers dispatched to the gas station to arrest Aaron.

ECF No. 32-18. The Officers knew from their investigation that Aaron was a big individual, standing above 6'3" and weighing more than 250lbs. *See* ECF No. 32-7. The Officers' bodycams capture the parties' encounter: Aaron was at the gas station waiting in line when King approached, grabbed Aaron's wrist, and stated "C'mon over here" while walking Aaron out of the line to a nearby freezer. ECF No. 32-20, 00:45-00:53. As Aaron walked over, he asked repeatedly "What's going on?" without receiving an answer. *Id.* The Officers surrounded Aaron, and after Pawlowski grabbed Aaron's other arm, the Officers turned Aaron so that his back is to them and ordered him to put his hands behind his back. *Id.*, 00:53-56.

As the Officers started to pull Aaron's hands behind him for handcuffing, defendants characterize the bodycams as showing Aaron "pulling away" while "turning or 'blading' his body," and asking different variations of "What's going on?" ECF No. 32-1, PageID.230. Without further detail, defendants assert that Aaron "actively resisted" during these moments. *Id.* at PageID.233. However, more accurately stated, the bodycam footage shows that as the Officers started pulling Aaron's hands behind him, Aaron pulled his hands back in front, stood facing the freezer, and either asked "What's going on?" or told the Officers that he would allow

himself to be handcuffed once he received an explanation. ECF No. 32-20, 00:56-01:17; ECF No. 32-21, 00:22-00:46.

After about twenty seconds of King trying to convince Aaron to comply and Aaron keeping his hands in front of himself and facing the freezer, Fielder asked the others, "You ready to go?" ECF No. 32-20, 00:56-01:18. Fielder then proceeded to lift Aaron's legs back out from under Aaron, while King and Pawlowski try to control Aaron's arms as Aaron fell to the floor and against the freezer. ECF No. 32-21, 00:46-00:54.

The four Officers piled on top of Aaron, repeatedly ordered him to give the Officers his hands and "stop resisting," and attempted to pull his hands in place for handcuffs; at the same time, Aaron repeatedly yelled "What's going on?", turned on the ground to lay on his side, and kept his hands in front of himself to prevent handcuffing. *Id.*, 0:53-1:15; ECF No. 32-20, 01:25-01:44.

The Officers' bodycam footage does not show precisely what Aaron and each Officer did in the next moments. Despite assertions of Aaron's "active resistance" and "struggle," ECF No. 32-1, PageID.231, 233, defendants do not provide any evidence of Aaron's other actions. On the other hand, Aaron points to Pawlowski's use-of-force report, which shows that after Aaron was taken down, Pawlowski used "Hard Hands" and

"struck Mr. Aaron three times in his side with [Pawlowski's] left knee." ECF No. 32-28, PageID.976. In any case, the bodycam footage shows that King threatened to break Aaron's arm if Aaron kept refusing to comply, leading Aaron to relent and let the Officers handcuff him. ECF No. 32-20, 01:44-02:00.

After the arrest, Aaron was charged with home invasion, unarmed robbery, and resisting and obstructing a police officer. *See* ECF No. 32-24. The charges were later dismissed.

## II. Standard of Review

Summary judgment is appropriate where the evidence in the record, viewed in its entirety, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The ultimate question for the court to determine on summary judgment "is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pham. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The moving party bears the initial burden of "informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation omitted). If the moving party carries its burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A non-moving party has not made that sort of showing if "the record taken as a whole could not lead a rational trier of fact to find" in the party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted).

In reviewing a motion for summary judgment, the court must "view the factual evidence and draw all reasonable inferences in favor of the non-moving party." *Williams v. Mauer*, 9 F.4th 416, 430 (6th Cir. 2021) (citation omitted). Further, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson*, 477 U.S. at 249.

However, when the record contains "a videotape capturing the events in question," the court may not adopt a "version of the facts for purposes of ruling on a motion for summary judgment" that "blatantly contradict[s]" the asserted version of events such that "no reasonable jury could believe it."

*Raimey v. City of Niles, Ohio*, 77 F.4th 441, 447 (6th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The court must "nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.'" *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017)).

### III. Analysis

Qualified immunity "shields government officials performing discretionary functions from liability for civil damages." *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011). Officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (citation omitted). The parties dispute both prongs.

### A.

Aaron claims that King, Fielder, and Pawlowski's uses of force during the arrest—specifically, these Officers' collective takedown and Pawlowski's three knee strikes while Aaron was on the floor—constituted excessive force in violation of the Fourth Amendment. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const.

amend. IV. Whether an officer's use of force in effecting an arrest violates the Fourth Amendment is a question of whether his actions are "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). In other words, an officer's subjective beliefs are irrelevant. *See Est. of Hill by Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).

Importantly, the inquiry is not whether *any* force was justified, but "whether the [officer] 'could reasonably use the *degree* of force'" employed. *Martin*, 712 F.3d at 958. The Court must assess the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020). It must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Martin*, 712 F.3d at 958. And it must bear in mind that police officers routinely face "tense, uncertain, and rapidly evolving" situations that "force[] split-second judgments" about the degree of force required. *Hicks*, 958 F.3d at 435 (quoting *Graham*, 490 U.S. at 396-97))*.*

Against this backdrop, three main factors guide the excessive force inquiry: (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Hicks*, 958 F.3d at 435. That said, the analysis ultimately boils down to the totality of the circumstances as would be perceived by a reasonable officer in the moment. *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015).

Turning to the first *Graham* factor, the severity of the crimes at issue, the parties do not dispute that Aaron was suspected of committing an unarmed robbery and a home invasion—two distinct and violent felonies. The severity of these crimes counsels against a finding of excessive force. *See Shumate v. City of Adrian*, 44 F.4th 427, 441-42 (6th Cir. 2022) (suggesting "severity of a crime weighs in favor of a finding that the use of force was *not* excessive where an individual is suspected of being involved in an underlying felony," especially if the felony is a "violent" one).

As for the second *Graham* factor, whether the suspect posed an immediate threat, the evidence shows that a reasonable officer at the scene would not have viewed Aaron as presenting an immediate threat to anyone's safety. The video evidence shows that in the moments leading up

to both the takedown and knee strikes,[2] Aaron kept his hands in front of himself while the Officers tried to handcuff him. It also shows that just before the takedown, Aaron stood in place facing a freezer, and before the knee strikes, Aaron lied on the ground moving his legs without force while all four Officers piled on top of him.

Nothing shows that Aaron assaulted the Officers, made any offensive gestures at them, or otherwise acted in a threatening or violent manner, which would present an immediate threat justifying the use of force. *See Laplante*, 30 F.4th at 580 (finding no immediate threat justifying takedown because officer did "not allege that Plaintiff assaulted him or made any offensive gestures"); *see also Shumate*, 44 F.4th at 444 (providing examples of immediate threats such as "violent thrashing, an attempt to hit officers, or by making a display of force" (cleaned up)). Although as defendants contend, Aaron was a big and strong man whom they had

---

[2] Defendants dispute whether Pawlowski struck Aaron with his knee after the takedown. However, due to the camera angles, close-up footage, and camera obstructions, the video evidence does not foreclose this possibility, as it does not show how Pawlowski used his knees during the moments after Aaron was taken down. *See* Fielder 0:54-1:20; McLoed 0:54-1:20. Moreover, Pawlowski admits in a use-of-force report that he used "Hard Hands" and "struck Mr. Aaron three times in his side with my left knee." ECF No. 32-28, PageID.976. This evidence is sufficient to allow a reasonable jury to find that Pawlowski indeed struck Aaron three times with his knee after the takedown. Whether other evidence ultimately proves that Pawlowski did not use such force is a question for the jury.

reason to believe was violent, a reasonable jury could find that, without more, these qualities indicate only that Aaron posed a potential threat—not an immediate one which would justify the use of force. *See Shumate*, 44 F.4th at 444 ("[M]ere 'agitated hand gestures' and profanity, unaccompanied by threats, fall short of the prototypical behavior that would make an officer fear for his physical safety").

Indeed, the videos show Aaron repeatedly asking, "What's going on?" throughout the arrest, indicating that Aaron was primarily confused. And given King's threat to break Aaron's arm, a reasonable jury could find that Aaron's behavior did not give the Officers reason to immediately fear for their safety. *Cf id.* (finding "particularly apt" the conclusion that suspect's behavior did not make officer reasonably fear for safety "where the officer likewise displayed a penchant for" allegedly threatening behavior).

As for the last *Graham* factor, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, defendants assert that Aaron actively resisted the arrest. However, they provide no explanation, analysis, or legal authority supporting their assertion. Because they advert to this issue in a perfunctory manner, they waive the issue. *See Alston v. City of Detroit Police Officers*, 717 F. Supp. 3d 618, 633 (E.D.

Mich. 2024) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) and *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017)).

Even if defendants had developed an argument as to active resistance, a reasonable jury could find that Aaron's noncompliance amounted to passive resistance that did not justify a takedown and three subsequent knee strikes. An important dividing line exists between active and passive resistance. *Goodwin*, 781 F.3d at 323. Active resistance can be recognized by some combination of "volatility, hostility, and danger in a way that increases with the passage of time." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). It requires not only a refusal to comply with orders but also "some outward manifestation" that suggests intentional disobedience or blatant resistance, such as refusing to be handcuffed, fleeing from the police, verbal hostility, or deliberate physical defiance. *Kent v. Oakland Cnty.*, 810 F.3d 384, 392 (6th Cir. 2016). Such active resistance may justify the degree of force needed to subdue a suspect. *E.g.*, *Laplante v. City of Battle Creek*, 30 F.4th 572, 581 (6th Cir. 2022) (use of takedown); *Kent*, 810 F.3d at 392 (use of taser). Passive resistance, however, will not justify the same response. *Kent*, 810 F.3d at 392. Passive resistance occurs when a suspect does not comply with an officer's orders, but the noncompliance is "not paired with any signs of

verbal hostility or physical resistance." *Eldridge*, 533 F. App'x at 535. Even repeated refusals to comply will not, by themselves, convert passive into active resistance. *See id.*

Viewing the evidence here in the light most favorable to Aaron, with respect to both the takedown and the knee strikes, Aaron's resistance only comprised keeping his hands in front of himself to prevent handcuffing and yelling questions at the Officers.[3] At most, this behavior amounts to passive resistance, as it was not paired with volatility, hostility, or danger. Aaron's repeated questioning about what was happening to him, coupled with the undisputed fact that the Officers never told Aaron before using force that he was under arrest, undercuts any claim that Aaron was intentionally disobedient or blatantly resistant so as to justify the takedown and three subsequent knee strikes. *See Saalim v. Walmart, Inc.*, 97 F.4th 995, 1005 (6th Cir. 2024) ("The general consensus among our cases is that officers cannot use force . . . on a detainee who . . . is not told he is under arrest, or is not resisting arrest." (quoting *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009)).

---

[3] The Officers' bodycam videos show closeup footage of the arrest at various angles, making it difficult for the Court to see all of Aaron's other actions, if any, which may constitute resistance. Defendants do not suggest any other actions by Aaron constituted resistance.

Because the evidence, when viewed in the light most favorable to Aaron, shows that despite Aaron's suspected involvement in two severe crimes, at no time during the arrest did Aaron present an immediate threat to anyone's safety or actively resist the arrest, a reasonable jury could find that the collective takedown by King, Fielder, and Pawlowski and the three subsequent knee strikes by Pawlowski constituted excessive force.

Further, taking Aaron's version of the facts, the uses of force here violated Aaron's clearly established right to be free from excessive force. For a right to be "clearly established" for qualified immunity purposes, the law at the time of the officer's conduct must be "sufficiently clear" such that "every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (cleaned up). This standard requires a high degree of specificity, especially where, as here, the Fourth Amendment is implicated. *Id.* at 63, 64 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12, (2015)). In this Circuit, "[d]rawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a [Fourth Amendment excessive force] claim pursued under § 1983." *Coffey v. Carroll*, 933 F.3d 577, 589 (6th Cir. 2019).

As the Sixth Circuit has previously held, "[b]y 2019, when this incident occurred, the right to be free from physical force when one is not actively

resisting the police was clearly established." *Shumate*, 44 F.4th at 450 (citing *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010); *Griffith v. Coburn*, 473 F.3d 650, 659-60 (6th Cir. 2007)); *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (per curiam) (finding right to be free from physical force when not actively resisting police specifically with respect to a takedown). Also by 2019, "it was clearly established that officers may not use gratuitous violence against an individual who [like Aaron] 'pose[d] no threat to the officers or anyone else.'" *Shumate*, 44 F.4th at 450 (quoting Griffith, 473 F.3d at 659-60). Thus, the unlawfulness of King, Fielder, and Pawlowski uses of force against Aaron, whom a reasonable jury could find was not actively resisting defendants or threatening to the Officers, was apparent.

Because a reasonable jury could find that King, Fielder, and Pawlowski's collective takedown and Pawlowski's three subsequent knee strikes violated Aaron's clearly established Fourth Amendment right to be free from excessive force, these Officers are not entitled to qualified immunity on Aaron's excessive force claim. Accordingly, the Court denies summary judgment on this claim.

**B.**

Aaron claims that the Officers violated their duty to intervene to prevent King, Fielder, and Pawlowski's uses of excessive force. To establish a failure to intervene claim, a plaintiff "must show that the officers (1) 'observed or had reason to know that excessive force would be or was being used, and (2) . . . had both the opportunity and the means to prevent the harm from occurring.'" *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

As defendants argue, no reasonable juror could find that the Officers had the opportunity and means to prevent the uses of force because Aaron's size and strength required each of them to participate in the arrest and the evidence undisputedly shows that during the arrest, each was engaged in attempting to physically gain control of or handcuff Aaron. *See Smith*, 874 F.3d at 946 (holding same in excessive force case because "[the officer] was occupied trying to gain control of [the plaintiff's] arms").

Aaron does not dispute that each Officer was occupied in effecting the arrest. *See* ECF No. 33, PageID.1018 ("Each officer participated in the use of unreasonable force."). Indeed, Aaron makes no effort to explain how any of the Officers would have had the means or opportunity, let alone

both, to prevent the uses of force, when each of them was occupied with arresting Aaron. Because Aaron fails to show that the Officers violated a duty to intervene to prevent the use of excessive force, the Officers are entitled to qualified immunity on this claim. Accordingly, the Court grants summary judgment in the Officers' favor on Aaron's failure-to-intervene claim.

## IV. Conclusion

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' motion for summary judgment (ECF No. 32). The Court **GRANTS** the motion as to Aaron's failure-to-intervene claim against all defendants and **DISMISSES** that claim (Count II). The Court **DENIES** the motion in all other respects, including King, Fielder, and Pawlowski's request for qualified immunity on Aaron's excessive force claim. Aaron's § 1983 claim for excessive force against King, Fielder, and Pawlowski will proceed to trial.

Dated: March 21, 2025

s/ Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge